# In the United States Court of Federal Claims

No. 19-400L
(Filed: February 1, 2023)

| | |
|---|---|
| **************************************<br><br>ELIZABETH G. BRADLEY et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>              Defendant.<br>************************************** | Trails Act; attorneys' fees and other<br>litigation expenses; 28 U.S.C. § 4654(c);<br>"actually incurred because of such<br>proceeding"; contingency fee agreements;<br>prelitigation expenses; lodestar calculation;<br>forum rule; attorneys' fees matrices;<br>duplicative and excessive hours;<br>unsuccessful claims; block billing;<br>substantiation of hourly rates and non-<br>attorneys'-fees litigation expenses |

Lindsay S.C. Brinton, St. Louis, MO, for plaintiffs.

Brian R. Herman, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

Plaintiffs in this case, along with plaintiffs in several other cases before the undersigned, own real property adjacent to a railroad line in Marion and Hamilton Counties, Indiana. They contend that the United States violated the Fifth Amendment to the United States Constitution by authorizing the conversion of the railroad line into a recreational trail pursuant to the National Trails Systems Act ("Trails Act"), thus acquiring their property by inverse condemnation. Eight of these landowners, through a settlement with defendant, obtained an award of just compensation and interest. They now seek to recover attorneys' fees and other litigation expenses pursuant to section 304(c) the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA"), 42 U.S.C. § 4654(c). As explained in more detail below, the court grants in part and denies in part their motion.

## I. BACKGROUND

Pursuant to an 1846 legislative charter, the Peru and Indianapolis Railroad Company constructed a railroad line within Indiana originating in the town of Peru, running through the towns of Kokomo and Noblesville, and terminating in Indianapolis. Eventually, in 1995, a portion of the line was purchased by three Indiana municipalities: the City of Fishers, the City of Noblesville, and Hamilton County. On August 1, 2017, the municipalities advised the Surface Transportation Board ("Board") of their collective desire to invoke the Trails Act, which, as amended, provides for the preservation of "established railroad rights-of-way for future reactivation of rail service" by authorizing the interim use of such rights-of-way as recreational

and historical trails.  16 U.S.C. § 1247(d).  The Board, in a May 31, 2018 decision, allowed the municipalities to pursue such railbanking.  Shortly thereafter, between June 8 and August 17, 2018, the municipalities submitted three separate requests to the Board, each relating to a different segment of the railroad line, for the issuance of a Notice of Interim Trail Use or Abandonment ("NITU").  The Board issued the three NITUs on December 21, 2018, and the municipalities executed trail-use agreements in 2019.

Before this suit was filed, plaintiffs' counsel of record, Lindsay S.C. Brinton, along with other attorneys and paralegals who worked in the St. Louis, Missouri office of the law firm now known as ArentFox Schiff LLP ("ArentFox Schiff"), engaged in certain prelitigation activities related to the railroad line at issue.  On January 21, 2019, while these efforts were ongoing, Ms. Brinton and her colleague, Meghan S. Largent, moved their practice to another law firm based in St. Louis:  Lewis Rice LLC ("Lewis Rice").  They and other Lewis Rice attorneys and paralegals continued their prelitigation activities.

On March 15, 2019, Ms. Brinton filed the initial complaint in this case on behalf of fifteen plaintiffs who contended that the United States acquired their property through inverse condemnation by operation of the Trails Act.[1]  Over the next year, while providing defendant with discovery regarding plaintiffs' claims, Ms. Brinton moved for the voluntary dismissal of the claims of sixteen plaintiffs and filed an amended complaint to add the claims of eighteen plaintiffs.  The parties then filed joint title stipulations on March 3, 2020, indicating that there were no title disputes with respect to the claims of the eight plaintiffs currently seeking attorneys' fees and other litigation expenses, and some title disputes with respect to the claims of the other nine plaintiffs.  Ms. Brinton filed a second amended complaint on May 22, 2022, which increased the total number of plaintiffs asserting claims to twenty-five.

To facilitate an orderly and efficient resolution of the claims in this case and three related cases,[2] the court on July 22, 2020, granted plaintiffs' motion to coordinate the proceedings in all four cases and adopted the proposal of the plaintiffs in the four cases to divide themselves into three groups:  Group 1 plaintiffs had claims with no outstanding liability issues and could proceed to damages, Group 2 plaintiffs had claims that required the resolution of an essentially identical threshold title issue, and Group 3 plaintiffs had claims with other threshold title issues.  In this case, the eight plaintiffs who are now seeking attorneys' fees and other litigation expenses under the URA, along with three other plaintiffs, were placed in Group 1, and the remaining fourteen plaintiffs were placed in Group 2.

---

[1]  For simplicity, "plaintiff" is used in this decision as a synonym for "property owner," and may refer to an individual, organization, multiple individuals (such as a married couple), or multiple organizations.

[2]  The other three cases are Oldham v. United States, No. 18-1961L (consolidated with Overlook At The Fairgrounds LP v. United States, No. 18-1962L); Pressly v United States, No. 18-1964L (consolidated with Jones v. United States, No. 19-1375L); and ATS Ford Drive Investment, LLC v. United States, No. 19-471L ("ATS Ford").

On September 28, 2020, while the Group 1 plaintiffs were pursuing damages, the parties began briefing cross-motions for summary judgment with respect to the title issue affecting the claims of the Group 2 plaintiffs.  In a March 23, 2021 decision issued in all four cases, the court held that the claims of most of the Group 2 plaintiffs must be dismissed.  Consequently, in this case, the court dismissed the claims of nine plaintiffs and moved the claims of the five remaining plaintiffs to Group 3.

Two weeks later, the court, in all four cases, set a schedule for briefing summary judgment motions related to the claims of the Group 3 plaintiffs.  However, in this case, shortly before plaintiffs' motion was due, the court granted the parties' request to stay the briefing deadlines.  The parties represented that they would apply the court's decisions in the related cases to the claims of the Group 3 plaintiffs in this case.

While the parties in two of the related cases were briefing the cross-motions for summary judgment, efforts to resolve the claims of the Group 1 plaintiffs were ongoing.  On August 11, 2021, the parties sought to vacate the remaining expert discovery deadlines so that they could enter into settlement discussions.  The court granted this request.  By December 27, 2021, the parties in this case had reached a tentative settlement as to the just compensation and interest owed to the eleven plaintiffs in Group 1, and were negotiating the reimbursement of attorneys' fees and other litigation expenses.

As for the claims of the Group 3 plaintiffs, the court ruled on the cross-motions for summary judgment filed in the related cases on April 1, 2022.  The parties in this case reviewed those rulings and determined that for the five claims at issue, two should be dismissed and three should be added to Group 1.  Upon the dismissal of the former claims on May 9, 2022, only fourteen plaintiffs remained in the case.

The parties subsequently attempted to reach a comprehensive settlement with respect to the remaining claims—encompassing just compensation, interest, attorneys' fees, and other litigation expenses—but reached an impasse related to the fees and other expenses sought by plaintiffs for the work performed by ArentFox Schiff.  Defendant extended an offer of judgment to eleven of the plaintiffs pursuant to Rule 68 of the Rules of the United States Court of Federal Claims ("RCFC").[3]  Three of these plaintiffs accepted the offer ("Rule 68 plaintiffs"), and on July 7, 2022, the court entered an RCFC 54(b) judgment as to their claims, as follows:

---

[3] The parties continue to discuss the resolution of the claims of the other three plaintiffs.

| Plaintiff | Just Compensation | Interest | URA Fees and Other Expenses | Total Amount | Per Diem Interest |
|---|---|---|---|---|---|
| Adrian Murray | $1,900.00 | $206.51 | $27,800.00 | $29,906.51 | $0.14 |
| Bennett & Associates Real Estate, LLC | $31,930.00 | $3,470.50 | $27,800.00 | $63,200.50 | $2.35 |
| Christina Nelson | $14,500.00 | $1,576.02 | $27,800.00 | $43,876.02 | $1.07 |
| Total | $48,330.00 | $5,253.03 | $83,400.00 | $136,983.03 | $3.56 |

That same day, the parties advised the court that they had reached a tentative settlement as to the just compensation and interest owed to the eight plaintiffs who did not accept defendant's offer of judgment.  On September 2, 2022, the parties filed a joint stipulation for the entry of a partial judgment as to these plaintiffs, and on September 6, 2022, the court entered an RCFC 54(b) judgment that awarded the following:[4]

| Plaintiff | Just Compensation | Interest | Total Amount | Per Diem Interest |
|---|---|---|---|---|
| Elizabeth G. Bradley | $14,500.00 | $1,576.02 | $16,076.02 | $1.07 |
| Denny W. Branham and Roberta L. Anderson | $51,250.00 | $5,570.40 | $56,820.40 | $3.77 |
| David A. Eads and Patricia A. Eads | $35,195.00 | $3,825.37 | $39,020.37 | $2.59 |
| Jeffrey A. Malkoff and Jane A. Malkoff | $22,500.00 | $2,445.54 | $24,945.54 | $1.65 |
| Paul B. Schafer | $20,100.00 | $2,184.69 | $22,284.69 | $1.48 |
| D-Two, Inc. | $15,000.00 | $1,630.36 | $16,630.36 | $1.10 |
| Molly McAffee and Deanna Strossner | $13,000.00 | $1,412.98 | $14,412.98 | $0.96 |
| Holly R. Wood | $13,000.00 | $1,412.98 | $14,412.98 | $0.96 |
| Total | $184,545.00 | $20,058.34 | $204,603.34 | $13.58 |

Shortly thereafter, these eight plaintiffs filed the present motion for attorneys' fees and other litigation expenses.  They request a total award of $352,181.50, broken down as follows:[5]

---

[4] Defendant represents in its response to plaintiffs' present motion that it paid the judgment on October 24, 2022, and that the total amount paid was $206,287.26.

[5] The total amount of attorneys' fees and other litigation expenses sought by plaintiffs for the work of Lewis Rice is off by one cent.  Because the error is minor, the court similarly will refer to the amount claimed for this work as "$239,805.06."

| Time Frame | Law Firm | Hours | Attorneys' Fees | Other Litigation Expenses | Total |
|---|---|---|---|---|---|
| Prior to February 2019 | ArentFox Schiff | 211.68 | $74,374.49 | $38,001.95 | $112,376.44 |
| January 22, 2019, to the Present | Lewis Rice | 476.31 | $206,285.55 | $33,519.50 | $239,805.06 |
| Total | | 687.99 | $280,660.04 | $71,521.45 | $352,181.50 |

Defendant raises a number of objections to plaintiffs' request.[6]  With respect to the attorneys' fees and other litigation expenses claimed for the work performed by Lewis Rice, defendant contends that:  the fee award should be limited to the amounts plaintiffs actually incurred pursuant to their contingency fee agreement with Lewis Rice; the hours claimed by Lewis Rice are unreasonable and should be reduced in several respects; Lewis Rice's hourly rates are unreasonably high; and some of Lewis Rice's claimed litigation expenses are not recoverable. With respect to the attorneys' fees and other litigation expenses claimed for the work performed by ArentFox Schiff, defendant contends that no amount is recoverable because ArentFox Schiff's fees and other expenses were incurred prior to litigation.  Defendant argues in the alternative that if ArentFox Schiff's fees and other expenses are recoverable, they are only recoverable on a quantum meruit basis and must be taken from the amount awarded to compensate Lewis Rice.  Moreover, defendant maintains that ArentFox Schiff cannot be reimbursed for its other expenses because it did not supply the necessary supporting documentation.  Plaintiffs filed a reply to respond to these objections.  Their motion is now fully briefed and the court, finding oral argument to be unnecessary, is prepared to rule.

## II. DISCUSSION

The URA waives the United States' sovereign immunity by requiring "the Government to assume the litigation expenses of counsel in bringing forth" a successful Fifth Amendment takings claim under the Tucker Act. Haggart v. Woodley, 809 F.3d 1336, 1357 (Fed. Cir. 2016); cf. Ardestani v. INS, 502 U.S. 129, 137 (1991) ("The [Equal Access to Justice Act] renders the United States liable for attorney's fees for which it would not otherwise be liable, and thus amounts to a partial waiver of sovereign immunity.").  Specifically, the URA mandates that when awarding a plaintiff compensation for a taking by a federal agency, the court "shall determine and award or allow to such plaintiff, as part of such judgment, . . . such sum as will in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding." 42 U.S.C. § 4654(c).  This provision is meant to ensure that plaintiffs "retain the full compensation of the value of their property" when it has been taken by

---

[6] For the remainder of this decision, unless otherwise specified, the court will refer to the eight moving plaintiffs as "plaintiffs."

the federal government.  Haggart, 809 F.3d at 1357; accord id. at 1359 (remarking that "the primary purpose" of § 4654(c) is to "render[] property owners whole").

The trial court "is afforded considerable discretion" in determining the reasonable amount of attorneys' fees and other expenses to be awarded under the URA.  Bywaters v. United States, 670 F.3d 1221, 1228 (Fed. Cir. 2012).  This discretion is "appropriate" in light of the trial court's "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  Nevertheless, plaintiffs remain obligated to sufficiently document the amount of attorneys' fees and other expenses to which they are entitled.  See id.; see also Biery v. United States, 818 F.3d 704, 715 (Fed. Cir. 2016) ("When a party has a burden of production, it must submit evidence in order to meet the burden.").

### A.  The Method by Which URA Attorneys' Fees Should Be Determined

Before determining the amount of attorneys' fees and other litigation expenses to which plaintiffs are entitled, the court must address two preliminary issues raised by defendant: (1) whether plaintiffs' recovery of attorneys' fees is limited by their contingency fee agreement with Lewis Rice and (2) whether plaintiffs are entitled to recover the attorneys' fees and other litigation expenses for the work performed by ArentFox Schiff during the eighteen months before this suit was filed.

### 1.  Plaintiffs' Recovery of Attorneys' Fees Is Not Limited to the Contingency Percentage Set Forth in Their Fee Agreement With Lewis Rice

Defendant first contends that pursuant to the URA, plaintiffs' recovery of attorneys' fees is limited to the fees that they "actually incurred," and that the fees they actually incurred are limited to the amount calculated using the contingency percentage specified in their fee agreement with Lewis Rice.[7]  This contention is not persuasive.

As defendant observes, the URA only allows for the reimbursement of litigation expenses that a successful plaintiff in an inverse condemnation suit "actually incurred."  42 U.S.C. § 4654(c).  Relying on the well-known canon of statutory construction that every word in a statute should be given effect to the extent possible, Duncan v. Walker, 533 U.S. 167, 174 (2001), defendant maintains that the use of "actually" to modify "incurred" means that the court "can only award those sums the plaintiff is in fact obligated to pay," Def.'s Resp. 6; in other words, the amount that the plaintiff agreed to pay the attorney.

By focusing narrowly on the phrase "actually incurred," defendant disregards another "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989); accord King v. St. Vincent's Hosp., 502 U.S. 215, 221

---

[7]  According to defendant, plaintiffs are entitled to attorneys' fees of $68,762.42—one-third of the amount of just compensation and interest paid pursuant to the September 6, 2022 partial judgment.

(1991) (following "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)).  The URA requires the court to "determine and award" an amount that "will in the opinion of the court . . . reimburse [the] plaintiff for his . . . reasonable attorney . . . fees[] actually incurred because of such proceeding."  42 U.S.C. § 4654(c).  In other words, it is the court's role to determine what it believes, in its "considerable discretion," Bywaters, 670 F.3d at 1228, is the amount that will reimburse a plaintiff for attorneys' fees actually incurred.  While a fee agreement may provide evidence of the fees actually incurred by a plaintiff, the court is not bound or constrained by the fee agreement's provisions.  Indeed, if the court adopted defendant's construction of § 4654(c), such that it would be required to award a plaintiff an amount specified in a fee agreement, the court would be deprived of the discretion granted by the statute, rendering the phrase "will in the opinion of the court" meaningless—violating the very canon of statutory construction touted by defendant.[8]

Moreover, the court is not convinced that there is a meaningful difference between the terms "actually incurred" and "incurred" that would affect its determination of the amount that would reimburse plaintiffs for their reasonable attorneys' fees.  Pursuant to the dictionary definitions supplied by defendant, "incur" means "to become liable" and "actually" means "in act or in fact."  Def.'s Resp. 5.  As the court in Preseault v. United States aptly remarked: "Colloquially, at least, one is either liable or one is not—no difference distinguishes one who has become liable from one who actually has become liable.  Conversely, an obligation that is not 'actually incurred' simply is not 'incurred.'"  52 Fed. Cl. 667, 675 (2002).  In fact, there are numerous examples in caselaw in which "actually incurred" and "incurred" are used interchangeably.  See, e.g., id. (citing three examples from the United States Court of Appeals for the Federal Circuit ("Federal Circuit")); Bywaters, 670 F.3d at 1232 n.7 (stating that the URA, which "requires that the attorneys' fees be 'actually incurred,'" sets forth a requirement "similar[]" to that imposed by 26 U.S.C. § 7430, which allows for the reimbursement of reasonable fees "incurred"—not "actually incurred"—by the plaintiff); Marré v. United States, 38 F.3d 823, 828-29 (5th Cir. 1994) (concluding that a fee-shifting statute that allows for the reimbursement of "reasonable litigation costs incurred," including "reasonable fees paid or incurred for the services of attorneys"—26 U.S.C. § 7430—"limits attorney's fees to those actually incurred").

---

[8]  In Washington Metropolitan Area Transit Authority v. United States, the court held that by using the words "reimburse" and "actually incurred" in 42 U.S.C. § 4654(c), "Congress intended plaintiffs to recover under the URA only attorney costs . . . they were actually obliged to pay."  57 Fed. Cl. 148, 150 (2003).  After concluding that the plaintiff could recover attorney's fees for the work of its in-house counsel, id. at 150, the court held that "under the standards of section 4654(c)," the plaintiff could not "receive an award based on market rates, but instead [was] restricted to a reimbursement of the costs 'actually incurred' as the result of the service of its in-house counsel," id. at 152; see also id. at 154 (concluding that the plaintiff was entitled to be reimbursed for "the salary and benefits of its in-house counsel, plus some allowance for overhead").  The case did not involve a fee agreement, and the court did not analyze § 4654(c)'s discretion-granting language.  Accordingly, this court respectfully declines to apply the holding in that decision to the facts of this case.

Finally, the fee agreement between plaintiffs and Lewis Rice does not limit plaintiffs' obligation to pay attorneys' fees to the amount calculated using the specified contingency percentage.  The second section of the fee agreement provides:

> The Firm has agreed to represent you, and the other property owners that join this action, on a contingency fee basis.  This means that if we are not successful in obtaining a judgment or award from the government there will be <u>no cost</u> to you for the Firm's professional services.  If we are successful, we will receive a fee that is the greater of either:

> (a)  one-third of the "Total Award" received by all property owners (or forty percent in the case of an appeal); or

> (b)  the statutory attorney fee determined by the Court.

> The "Total Award" includes the damage award for the value of the property taken, all interest awarded upon this amount, and the award of a statutory attorney fee (less any unreimbursed expenses).

> We charge for legal services on the basis of the time devoted to your matters by our professional staff in performing the services.  Our rates are determined by our Firm's national rates in effect at the time of payment.  These rates may be adjusted from time to time, typically on an annual basis.

Def.'s Ex. 1 at 2.  First, this language indicates that Lewis Rice will receive the greater of the contingency amount or the statutory fees determined by the court, not, as defendant contends, just the contingency amount.  Second, the explanation of how Lewis Rice charges for its services in the final excerpted paragraph, which has no relevance to the contingency percentage calculation described in option (a), strongly suggests that the "statutory attorney fee" described in option (b) refers to a lodestar calculation—the number of hours reasonably expended multiplied by a reasonable hourly rate.  See <u>Bywaters</u>, 670 F.3d at 1225-26 (describing the lodestar calculation).

In light of the above, the court will determine the amount of reasonable attorneys' fees allowed under 42 U.S.C. § 4654(c) for the work performed by Lewis Rice by calculating the lodestar amount.

### 2.  Plaintiffs Are Entitled to Reimbursement for Attorneys' Fees and Other Litigation Expenses for Work Performed by ArentFox Schiff

With respect to plaintiffs' request for reimbursement of the attorneys' fees and other litigation expenses claimed by ArentFox Schiff, defendant contends that no such amounts are recoverable because ArentFox Schiff's work was performed before the complaint in this suit was filed.  Its argument is premised on the statutory requirement that when a plaintiff prevails in an inverse condemnation suit, reimbursable litigation expenses are limited to those "actually incurred because of such proceeding."  42 U.S.C. § 4654(c).  According to defendant, an expense

incurred before a proceeding is initiated cannot be an expense incurred "because of" that proceeding.  Defendant construes the phrase "because of such proceeding" too narrowly.

In Emeny v. United States, the plaintiffs sought reimbursement under the URA for the expenses they incurred while "endeavoring to ascertain the nature and extent of their property right" and "trying to obtain a recognition of such right from the Government through negotiations."  526 F.2d 1121, 1124 (Ct. Cl. 1975) (per curiam).  The court held that such expenses "certainly were not incurred by the plaintiffs 'because of' the proceeding which they subsequently instituted . . . after the failure of the negotiations with the Government," and that "the plain language of 42 U.S.C. § 4654(c) precludes the court from including in its award to the plaintiffs any reimbursement for expenses incurred by the plaintiffs before they decided to file suit . . . ."  Id.  Put another way, plaintiffs cannot obtain reimbursement for expenses under § 4654(c) if they would not have incurred those expenses absent the suit for inverse condemnation.

In explicitly and implicitly applying the URA's "because of such proceeding" requirement, the United States Court of Federal Claims ("Court of Federal Claims") has denied reimbursement for the prelitigation costs of a quiet title action, Town of Grantwood Vill. v. United States, 55 Fed. Cl. 481, 484-85 (2003); an appeal challenging the constitutionality of the Trails Act that preceded the inverse condemnation suit, Preseault, 52 Fed. Cl. at 671-72; preparing a litigation strategy memorandum prior to filing suit, Otay Mesa Prop., L.P. v. United States, 124 Fed. Cl. 141, 147 (2015); and work performed prior to the plaintiffs' engagement of counsel, Campbell v. United States, 138 Fed. Cl. 65, 71 (2018).  In contrast, it has allowed reimbursement for the prelitigation costs of "work investigating plaintiffs' claims [and] establishing the facts necessary to file a case on behalf of a class," Greenwood v. United States, 131 Fed. Cl. 231, 241 (2017); and "preparing the complaint," Campbell, 138 Fed. Cl. at 71; accord Grantwood Vill., 55 Fed. Cl. at 485.  The court in Grantwood Village expressly relied on the Federal Circuit's decision in Yancey v. United States, 915 F.2d 1534 (Fed. Cir. 1990), to award certain prelitigation costs.  55 Fed. Cl. at 485.  In Yancey, the Federal Circuit acknowledged that "pre-litigation expenses are precluded from reimbursement under 42 U.S.C. § 4654(c) . . . ."  915 F.2d at 1543 (citing Emeny, 526 F.2d at 1124).  However, quoting a nonbinding decision of the United States Claims Court, it remarked that "'the significant effort expended' in 'the filing of the petition' may be compensable under the statute if proper documentation were provided."  Id. (quoting Cloverport Sand & Gravel Co. v. United States, 10 Cl. Ct. 121, 124 (1986)).  Defendant argues that reliance on Yancey for the proposition that the costs of preparing a complaint are reimbursable is improper because the court in Yancey could not alter the holding of the United States Court of Claims' earlier decision in Emeny.  The court does not adopt defendant's reading of Yancey.  Rather, it understands Yancey as suggesting that costs related to the filing of a complaint are not the type of prelitigation expenses that are unreimbursable under the URA since they are attributable to the inverse condemnation suit.  Accord Emeny, 526 F.2d at 1124 (prohibiting only the reimbursement of expenses incurred before the plaintiffs "decided" to commence litigation).  In short, although work performed in preparation for filing a complaint necessarily occurs before filing suit, it may nevertheless qualify as work performed "because of" the suit.

Defendant next argues that even if ArentFox Schiff's work was performed "because of" this suit, plaintiffs remain unable to obtain reimbursement for that work because they are not liable to ArentFox Schiff for attorneys' fees or other litigation expenses. Specifically, defendant maintains that the determination of the fees and other expenses actually incurred by plaintiffs for the work of ArentFox Schiff is controlled by their fee agreement, which, using language identical to the language in the Lewis Rice fee agreement, made the recovery of fees and other expenses contingent on ArentFox Schiff obtaining a judgment in plaintiffs' favor. Defendant asserts that "under state law, ArentFox [Schiff], having been discharged before the contingency was met, is entitled only to a quantum meruit recovery for the value of its services, to be paid from the fees recovered by subsequent counsel, i.e., Lewis Rice." Def.'s Resp. 29.

Plaintiffs characterize defendant's argument as "bewildering and nonsensical," Pls.' Reply 27, and emphasize that in another case before the Court of Federal Claims involving the plaintiffs' retention of a new attorney, the court observed that the former attorney's firm had "a property interest resulting from its fee agreement with its former clients" and that the subsequently retained attorney "represent[ed] the interests of her clients in not breaching their agreement to pay [the former attorney's firm] for the work it performed," id. at 28 (quoting Banks v. United States, No. 16-1633L, 2020 WL 1673698, at *2 (Fed. Cl. Apr. 6, 2020)).[9] Highlighting defendant's "admi[ssion] that [ArentFox Schiff] is due a quantum meruit fee," id. at 27, plaintiffs assert that under the URA, they are entitled to reimbursement for the work performed by ArentFox Schiff because the attorneys' fees and other litigation expenses "were 'actually incurred' by [them] and owed to [ArentFox Schiff] under [their] engagement agreement with [ArentFox Schiff]," id. at 28.

Defendant's entire argument is premised on its contention that the phrase "actually incurred" in 42 U.S.C. § 4654(c) limits the recovery of attorneys' fees and other litigation expenses to those that plaintiffs are obligated to pay pursuant to their fee agreements. However, as the court has already held, defendant's construction of § 4654(c) is erroneous because it strips the court of the discretion afforded by that provision. Thus, because the operative language of the Lewis Rice and ArentFox Schiff fee agreements is identical, the court will determine the amount that would reimburse plaintiffs for the reasonable fees they actually incurred for the

---

[9] While the quotations from the unpublished order in Banks are accurate, plaintiffs disregard their context. The court in Banks was ruling on a motion to intervene by the plaintiffs' former attorney, who was concerned that the current attorney might "compromise her client's award of fees to incentivize settlement and more quickly get her clients paid." 2020 WL 1673698, at *1. It remarked that "[a]ny compromise that would seriously impair the [prior attorney]'s ability to be adequately reimbursed for [his] work would likely open the plaintiffs to liability for breach of contract or liability to reimburse the firm in quantum meruit," and expressed confidence that the current attorney would endeavor "to avoid that possibility." Id. at *2. The court therefore denied the prior attorney's request to intervene. At most, Banks stands for the proposition that a plaintiff's current attorney is responsible for ensuring that any settlement of her clients' claims takes into account their obligations to their former attorney. Any suggestion of what might happen if the current attorney did not protect her clients' interests is dicta; indeed, the court did not discuss, much less mention, the precise nature of the plaintiffs' obligations under their fee agreement with their former attorney.

work performed by ArentFox Schiff by calculating the lodestar amount.  It will also determine the amount that would reimburse plaintiffs for the other reasonable expenses they actually incurred for the work performed by ArentFox Schiff in accordance with the applicable caselaw.

### B.  Reimbursement for Work Performed by Lewis Rice

The court turns first to the $206,285.55 in attorneys' fees and $33,519.50 in other litigation expenses requested by plaintiffs for the work performed by Lewis Rice from 2019 to 2022.[10]

### 1.  Attorneys' Fees

"In determining the amount of reasonable attorneys' fees under federal fee-shifting statutes, the Supreme Court has consistently upheld the lodestar calculation as the 'guiding light of [its] fee-shifting jurisprudence.'" Bywaters, 670 F.3d at 1228-29 (quoting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551 (2010)).  This calculation involves multiplying the number of hours reasonably expended in the case by a reasonable hourly rate. Id. at 1225-26.  "A fee award that is determined through the use of a lodestar calculation carries a 'strong presumption' that it represents a 'reasonable' attorney fee." Biery, 818 F.3d at 710 (quoting Bywaters, 670 F.3d at 1229).

### a.  Reasonable Hourly Rates

The first required determination is the reasonable hourly rates for the work performed by the attorneys and paralegals at Lewis Rice in 2019, 2020, 2021, and 2022.  In their motion, plaintiffs seek hourly rates of $550, $585, $635, and $660 for Ms. Brinton; $570, $595, $645, and $660 for Ms. Largent; $495 for Michael Armstrong (2022 only); $250 for Sarah L. White (2019 only); $215 for Katherine G. McWherter (2019 only); $275 for Evan P. Jefferson (2022 only); and from $115 to $210 for the law firm's paralegals.  They represent that these hourly rates are the usual and customary hourly rates charged by Lewis Rice in St. Louis for the years in question.

"[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984).  Additionally, "[i]n determining a reasonable rate, the court may refer to declarations made by other attorneys about the prevailing hourly rates in a particular geographic area and may also rely on its own expertise to determine applicable prevailing rates." Stimson Lumber Co. v. United States, 154 Fed. Cl. 694, 702 (2021) (citing Haggart v. United States, 149 Fed. Cl. 651, 659 (2020)), appeal docketed, No. 22-1201 (Fed. Cir. Nov. 30, 2021).

---

[10]  Plaintiffs are requesting attorney's fees and other litigation expenses for the work performed by Lewis Rice through the date they filed their present motion—September 20, 2022.  However, they state that "[s]hould litigation as to reimbursement under the URA become protracted, [they] reserve all rights to supplement" their request.  Pls.' Mot. 15 n.6.

In general, a court should use the prevailing market rates for comparable legal services in the forum when calculating the lodestar unless "the bulk of the work is done outside of the [forum] in a legal market where the prevailing attorneys' rates are substantially lower." Bywaters, 670 F.3d at 1233 (alteration in original) (quoting Avera v. Sec'y of HHS, 515 F.3d 1343, 1349 (Fed. Cir. 2008)). Accordingly, the typical approach used to assess the reasonableness of requested hourly rates is to first determine whether the forum rates or the local rates should serve as the proper comparators, and then determine whether the requested rates are in line with those from the relevant legal market. See, e.g., Bywaters, 670 F.3d at 1232-34; McCarty v. United States, 142 Fed. Cl. 616, 621-624 (2019); Campbell, 138 Fed. Cl. at 75-78; Gregory v. United States, 110 Fed. Cl. 400, 406 (2013). Plaintiffs, however, do not take this approach. Instead, they assert that their requested hourly rates—the usual and customary rates charged by Lewis Rice in St. Louis—are both (1) consistent with the prevailing market rates in St. Louis for the type of legal services at issue and (2) not significantly different from the forum rates (i.e., the rates in the District of Columbia, the location of the Court of Federal Claims) for those same legal services.[11] Put another way, under plaintiffs' approach, it does not matter whether the relevant legal market is St. Louis or the District of Columbia because the requested hourly rates are in line with the hourly rates in both.[12] This approach, while unusual, does not

---

[11] Plaintiffs contend that "[i]n other cases, the Court . . . has found that there is not a 'very significant difference' between the 'forum' rate and the rate found in the relevant community, and has awarded a firm's usual and customary fees." Pls.' Mot. 14 (citing McCarty, 142 Fed. Cl. at 616; Campbell, 138 Fed. Cl. at 65). Their characterization of the awards in these cases is erroneous. In McCarty, the plaintiffs were represented by an attorney who worked for a national law firm, and legal work was performed on their behalf by attorneys and paralegals in six locations throughout the country, including St. Louis and the District of Columbia. 142 Fed. Cl. at 622. The court accepted the plaintiffs' evidence that the disparity between the St. Louis and District of Columbia legal markets could be measured by the disparity between the hourly rates their attorney's law firm charged in those markets, and concluded that the 15% disparity was not very significant. Id. at 622-23. It therefore awarded attorneys' fees using the forum rates set forth in an attorneys' fees matrix applicable to the forum. Id. at 624. It did not award the plaintiffs attorneys' fees based on the usual and customary hourly rates charged by their attorney and others who worked on their case. In Campbell, the court found that the bulk of the work was performed in St. Louis, but that "because the St. Louis rates [were] not substantially lower than the claimed [District of Columbia] rates," it would "determine reasonable rates under the forum rule." 138 Fed. Cl. at 75-76. The plaintiffs sought attorneys' fees based on the hourly rates actually charged by their attorney's national law firm, and the court found that these rates did "not appear to be excessive when compared to top rates in" the District of Columbia. Id. at 76. However, it declined to award attorneys' fees based on the rates actually charged due to "the lack of specific proof regarding prevailing rates for services similar to the work done in [that] relatively non-complex rails-to-trails" case. Id.; cf. Pls.' Reply 16 (reflecting that the hourly rates for partners allowed in Campbell were much higher than in other Trails Act cases, notwithstanding the "non-complex" nature of the work done in that case).

[12] Given plaintiffs' nonstandard approach to applying the forum rule, defendant somewhat understandably construes plaintiffs' use of St. Louis rates as an invocation of the exception to the forum rule. See Def.'s Resp. 21-22 ("Plaintiffs appear to concede that St. Louis

conflict with the forum rule in the circumstances of this case, where plaintiffs maintain that their requested hourly rates are consistent with both St. Louis rates and District of Columbia rates, because under both the forum rule and plaintiffs' approach, the court must assess whether the requested hourly rates are in line with the forum rates.

In support of their position that the hourly rates requested for Lewis Rice are reasonable, plaintiffs submit sworn declarations from three attorneys; a sworn declaration from a Lewis Rice client in another Trails Act case; filings from a case in the United States District Court for the District of Missouri in which Lewis Rice requested, and was awarded, attorneys' fees at the hourly rates requested in this case; and salary tables published by the United States Office of Personnel Management ("OPM") for the St. Louis and District of Columbia metropolitan areas. Plaintiffs also provide, in the body of their motion, excerpts from three attorneys' fees matrices that have been used by federal courts in the District of Columbia when awarding attorneys' fees pursuant to a federal fee-shifting statute.[13]

Almost none of this evidence is germane to the principal question that needs to be answered: Are plaintiffs' requested hourly rates for Lewis Rice attorneys and paralegals in line with forum rates?[14]  Three of the declarants—Ms. Brinton; Robert B. Walsh, Jr., the chairman of Lewis Rice; and Emily E. Cantwell, a partner at another law firm in St. Louis—provide only the conclusory statement that the requested rates "are reasonable and consistent with the prevailing market rates charged in the St. Louis legal market for such services."  Pls.' Ex. A-3 ¶ 13; accord Pls.' Exs. A-4 ¶ 8, A-5 ¶ 4.  The fourth declarant—William Marshall Kotis, III, an individual who retained Lewis Rice to pursue a Trails Act claim currently before another judge of the Court of Federal Claims—states only that he is paying attorneys' fees to Lewis Rice at the requested

---

rates are appropriate in this instance.  The United States agrees with the use of St. Louis rates. But in asserting Plaintiffs' counsels' rates are reasonable, they spend much time comparing them not to reasonable rates in the St. Louis market, but to various efforts to determine hourly rates in Washington, D.C.  The proper comparison, however, in determining whether the asserted rates are reasonable is by comparison to the 'prevailing market rates in the relevant community.' Given Plaintiffs' framework, the comparison is to prevailing market rates in St. Louis." (citations omitted) (quoting Bratcher v. United States, 136 Fed. Cl. 786, 792 (2018))).  However, because plaintiffs claim that St. Louis rates are not substantially lower than District of Columbia rates, plaintiffs cannot be invoking the exception to the forum rule.  See Bywaters, 670 F.3d at 1233 (explaining that the exception applies only when the local rates are "substantially lower" than the forum rates).

[13]  Plaintiffs identify the websites where each excerpted matrix can be found, but provide no information—in their motion, reply, or attached exhibits—regarding what the information in each matrix is meant to reflect or any evidence supporting the applicability of the matrices to this case.  Although it was not its responsibility to do so, the court obtained some of that information by visiting the three websites and reviewing relevant caselaw.

[14]  Even if plaintiffs successfully demonstrate that the usual and customary rates charged by Lewis Rice are in line with the prevailing market rates in St. Louis, they still must show that those rates are in line with District of Columbia rates.

hourly rates and finds them to be reasonable and appropriate.  The federal district court filings address only the prevailing market rate for legal services in St. Louis.  And, the OPM charts merely demonstrate the difference in locality pay between the St. Louis and District of Columbia metropolitan areas for federal employees.  There is no mention of the prevailing market rates for legal services in the District of Columbia in any of these documents.

The only evidence of the forum rate supplied by plaintiffs is the excerpts from three attorneys' fees matrices:  an adjusted <u>Laffey</u> matrix, the United States Attorney's Office ("USAO") matrix, and the Fitzpatrick matrix.  Each matrix is "a schedule of billing rates based on an attorney's level of experience, adjusted for inflation . . . ."  <u>McCarty</u>, 142 Fed. Cl. at 623.  Both the <u>Laffey</u> matrix, prepared in 1983, and an updated version of the <u>Laffey</u> matrix, prepared in 1989, were meant to reflect the hourly rates charged by attorneys engaged in complex federal litigation in the District of Columbia.  <u>DL v. Dist. of Columbia</u>, 924 F.3d 585, 589 (D.C. Cir. 2019).  In the decades that followed, these matrices were updated to account for inflation.  <u>Id.</u>

> The USAO maintained one version of the matrix, relying on the original 1983 base data updated through a Bureau of Labor Statistics inflation index that tracks regional price increases in all goods.  Some plaintiffs' attorneys argued that this index failed to capture the true rate of inflationary change and began advancing a version of the 1989 <u>Laffey</u> data updated with a different Bureau of Labor Statistics index called the Legal Services Index (LSI), which estimates price increases for the legal market nationwide.

<u>Id.</u> at 589-90 (citation omitted).  Starting in 2015, the USAO undertook "a major effort to replace the <u>Laffey</u> datasets by using a more current rate survey as the base for a brand new matrix."  <u>Id.</u> at 590.  This new USAO matrix used data from attorneys "engaged in all types of practice" in the District of Columbia metropolitan area and set forth "average rates hundreds of dollars below those reflected in the LSI <u>Laffey</u> matrix."  <u>Id.</u>  The United States Court of Appeals for the District of Columbia Circuit concluded in 2019 that this new matrix did not reflect the prevailing market rates in the District of Columbia for the type of legal work being provided, <u>id.</u> at 587-88, and suggested that the court's bar "work together and think creatively about how to produce a reliable assessment of fees charged for complex federal litigation in the District [of Columbia]," <u>id.</u> at 595.  In response to this suggestion, the USAO developed, with the assistance of Professor Brian Fitzpatrick at Vanderbilt Law School, a new matrix based on data from complex federal cases litigated in the District of Columbia, adjusted for inflation using the legal services index of the Consumer Price Index.  <u>See</u> U.S. Attorney's Office for the Dist. of Columbia, <u>The Fitzpatrick Matrix</u>, https://www.justice.gov/usao-dc/page/file/1504361/download (last visited Jan. 9, 2023).

There are large variations in the hourly rates included in the three matrices relied upon by plaintiffs.  For example, the hourly rate for an attorney, like Ms. Brinton, with approximately fifteen years of experience as of 2021 is $764 in the adjusted <u>Laffey</u> matrix, $532 in the USAO matrix, and $626 in the Fitzpatrick matrix—a 19.8% difference between the lowest and highest rates.  Nevertheless, it appears that plaintiffs' requested rates are within the range of rates set forth in the matrices.  For Ms. Largent and Ms. Brinton, attorneys with approximately thirteen to seventeen years of experience during this litigation, plaintiffs request hourly rates of $550-$660; the three matrices reflect hourly rates of $742-$829, $491-$532, and $573-$666 for attorneys

with similar years of experience. For Mr. Armstrong, an attorney with approximately eight years of experience when he worked on this case, plaintiffs request an hourly rate of $495; the three matrices reflect hourly rates of $676-$733, $452, and $576 for attorneys with similar years of experience. For Ms. White, Ms. McWherter, and Mr. Jefferson, attorneys with less than two years of experience when they worked on this case, plaintiffs request hourly rates of $210-$275; the three matrices reflect hourly rates of $203-$413, $307-$333, and $395-$457 for attorneys with similar years of experience. And, for the seven paralegals who worked on the case, plaintiffs request hourly rates of $115-$210; the three matrices reflect hourly rates of $202-$225, $166-$180, and $189-$207 for paralegals.

The sole remaining question, therefore, is whether the work performed by the Lewis Rice attorneys and paralegals in this Trails Act case constitutes the type of complex federal litigation that the three matrices are meant to address such that the court can conclude that their hourly rates "are in line with those prevailing in the community for similar services . . . ." Blum, 465 U.S. at 895 n.11. Although plaintiffs did not address whether the matrices would apply in Trails Act suits, there is ample support in the caselaw to conclude that they could. See, e.g., Biery, 818 F.3d at 714 (holding that the Court of Federal Claims had the discretion to use one of the updated Laffey matrices to compute the lodestar amount in a Trails Act case); McCarty, 142 Fed. Cl. at 624 (awarding attorneys' fees in a Trails Act case based on the USAO matrix); Campbell, 138 Fed. Cl. at 76-77 (observing that "rails-to-trails takings claims can be complex" and using two adjusted Laffey matrices as evidence of reasonable hourly rates); see also Hardy v. United States, 157 Fed. Cl. 464, 472 (2021) (characterizing experience in Trails Act cases as "specialized experience in . . . a niche area of law"); Gregory, 110 Fed. Cl. at 406 (remarking that Trails Act litigation is "complex" and "highly specialized," and that "[v]ery few firms in the country have the willingness and the expertise to take on these" cases). In addition, unlike in Campbell, in which there were no substantive motions and the sole "in-court activity was limited to argument on the fee request," 138 Fed. Cl. at 70, this Trails Act case is readily classified as complex. It involved numerous claims proceeding on three tracks, coordination with the attorneys in three related cases, and briefing a summary judgment motion on a weighty issue of state law. Consequently, the three attorneys' fees matrices relied upon by plaintiffs provide appropriate comparators for the work performed by the Lewis Rice attorneys and paralegals in this case.

Having concluded that the hourly rates requested by plaintiffs for the work performed by Lewis Rice attorneys and paralegals "are in line with those prevailing in the community for similar services by lawyers [and paralegals] of reasonably comparable skill, experience and reputation," Blum, 465 U.S. at 895 n.11, the court approves their use in this case.

**b. Reasonable Hours**

The other element of the lodestar calculation is the number of hours reasonably expended by Lewis Rice in furtherance of plaintiffs' claims. Plaintiffs represent that the attorneys and paralegals at Lewis Rice expended 820.55 hours on this case, and seek reimbursement for the 476.31 hours that are purportedly attributable to their claims. In support of their request, plaintiffs provide a table with Lewis Rice's billing entries that includes, for each entry, the date, timekeeper, number of hours, hourly rate, and total fee, as well as a description of the work

performed.  Defendant raises several objections to plaintiffs' request, which the court addresses
in turn.

### i.  Duplicative and Excessive Billing Entries

Defendant first states that upon its review of Lewis Rice's billing entries, it identified
identical billing entries for Ms. Brinton on two dates:  March 5, 2020, and March 13, 2020.  On
the former date, there are two entries seeking 0.7 hours for work described as "[d]raft complaint;
review deeds and title work; conference with M. Largent," and on the latter date, there are two
entries for 0.3 hours for work described as "[c]lient correspondence; review property records."
Def.'s Resp. 20 (quoting Pls.' Ex. A-1 at 8).  Defendant asserts that it should not be required to
reimburse plaintiffs for the duplicative hours.  In their reply, plaintiffs do not provide an
explanation for the duplicative entries (for example, that Ms. Brinton performed similar work at
two different times on those dates).  Consequently, as defendant proposes, the court will reduce
the hours requested for Ms. Brinton's work by one hour, leading to a $585.00 reduction.

In addition, defendant identifies a single billing entry as reflecting an excessive and
unreasonable amount of time to accomplish the described task:  a November 1, 2019 entry in
which the timekeeper, a paralegal, indicated that it took 0.7 hours (forty-two minutes) to file a
status report.  Defendant proposes a 50% reduction of the time requested for this task.  In their
reply, plaintiffs do not address defendant's meritorious objection.  As a result, as defendant
proposes, the court will reduce the hours requested for this paralegal's work by 0.35 hours,
leading to a $52.50 reduction.

### ii.  Unsuccessful Claims

Defendant next contends that plaintiffs are seeking reimbursement for hours expended on
the claims of plaintiffs who were dismissed from the case, either voluntarily or through summary
judgment, and argues that such reimbursement is improper.  In response, plaintiffs argue that all
of the requested hours are compensable, and that defendant disregards two key facts:  that all of
the claims "were part of a single litigation and involved identical questions of law" and that
Lewis Rice's work was "conducted generally on behalf of successful <u>and</u> unsuccessful claims,
and could not feasibly be conducted on a plaintiff-specific basis."  Pls.' Reply 12.

As explained by the Federal Circuit:

> There is no dispute that work done on behalf of . . . unsuccessful plaintiffs
> is not recoverable.  "Hours that are not properly billed to one's <u>client</u> are also not
> properly billed to one's <u>adversary</u> pursuant to statutory authority."  When multiple
> claims are brought in a single litigation and involve common questions of law, it
> may be difficult, if not impossible, to separate out the hours expended on each
> claim.  However, . . . this does not compel the conclusion that all work involved is
> always compensable.  A fee award is subject to a court's discretion and a court
> "may attempt to identify specific hours that should be eliminated, or it may
> simply reduce the award to account for the limited success."

Biery, 818 F.3d at 712 (citation omitted) (quoting Hensley, 461 U.S. at 434, 436-37); see also Smith v. McDonough, 995 F.3d 1338, 1345 (Fed. Cir. 2021) ("[C]ourts properly award attorney fees for time necessarily spent on a successful claim, even if that time was also spent on unsuccessful claims."). The table setting forth Lewis Rice's billing entries does not assign entries to specific clients, and often the descriptions provided do not identify the client for whom the work related.[15] It therefore is not possible, for the most part, to "separate out the hours expended" on a claim-by-claim or plaintiff-by-plaintiff basis. Biery, 818 F.3d at 712. Consequently, when such separation is not possible, the court will, if appropriate, use a percentage method for reducing hours to ensure that defendant is providing reimbursement only for work performed on behalf of the plaintiffs with successful, or likely successful, claims.

To facilitate consideration of defendant's objections, the court divides the case into five time periods: (1) from January 22, 2019, the date Lewis Rice began recording time in this case, to March 14, 2019; (2) from March 15, 2019, the date that the initial complaint was filed on behalf of fifteen plaintiffs, to July 11, 2019; (3) from July 12, 2019, the date that the first amended complaint was filed on behalf of twenty-nine plaintiffs, to July 21, 2020; (4) from July 22, 2020, the date that the court divided plaintiffs into three groups, to March 22, 2021; and (5) from March 23, 2021, the date that the court granted summary judgment dismissing the claims of nine Group 2 plaintiffs and moving the claims of the five remaining Group 2 plaintiffs to Group 3, to the present.

During the first time period, Lewis Rice corresponded and met with its clients, reviewed property records, inspected the trail, and drafted the initial complaint. There is no indication that Lewis Rice conducted research on any factual or legal issues that would affect more than one of the fifteen plaintiffs named in the initial complaint. Rather, almost all of the work performed appears to be client-specific—communicating with clients and reviewing information concerning the property owned by each client. Because ten of these plaintiffs had unsuccessful claims,[16] a corresponding proportional reduction in hours for this time period is warranted. The court therefore reduces plaintiffs' requested hours for each timekeeper by 67%, leading to an award of $11,503.97 for this time period (the requested amount of $35,445.50 minus $585.00 for the duplicative entries, minus 67% of the difference).

During the second time period, Lewis Rice corresponded and met with its clients; reviewed property records; inspected the trail; worked on initial disclosures and a claims book; voluntarily dismissed the claims of four plaintiffs; and drafted the first amended complaint to add

[15] For example, there are 135 billing entries for reviewing, preparing, working on, or responding to "client correspondence" that do not identify the client or clients at issue. See generally Pls.' Ex. A-1.

[16] The five plaintiffs with successful claims are Ms. Bradley; Mr. Branham and Ms. Anderson; D-Two, Inc.; the Malkoffs; and Mr. Schafer.

the claims of eighteen new plaintiffs, four of which had or likely will have successful claims.[17] Almost all of this work is client-specific.  In contrast, Lewis Rice also performed work during this time period that could be, or was, applicable to more than one plaintiff:  reviewing relevant Board filings; preparing and issuing subpoenas; researching the original conveyances to the railroad company; and, as reflected in a single billing entry on July 5, 2019, researching Indiana law related to whether a deed conveyed a fee simple estate or an easement.  If the court considered only the client-specific work, it would reduce the requested hours for this time period by up to 73%, since Lewis Rice's work concerned the claims of up to twenty-four plaintiffs (out of thirty-three total) who did not have successful claims.  However, Lewis Rice also performed a moderate amount of generally applicable work.  Therefore, the court reduces plaintiffs' requested hours for each timekeeper by 50%, leading to an award of $28,396.75 for this time period (the requested amount of $56,793.50 minus 50% of that amount).

During the third time period, Lewis Rice corresponded and met with its clients; reviewed property records; inspected the trail; twice amended the complaint to add the claims of eighteen plaintiffs; voluntarily dismissed the claims of twelve plaintiffs; supplied defendant with information about the claims of all plaintiffs; and reached title stipulations with defendant with respect to the claims of twenty-five plaintiffs, including the eight plaintiffs who filed the present motion.  Almost all of this work is client-specific.  In contrast, Lewis Rice also performed work during this time period that could be, or was, applicable to more than one plaintiff:  reviewing relevant Board filings, preparing subpoenas, reviewing subpoena responses, researching the original conveyances to the railroad company, researching various aspects of Indiana property law, and developing a proposal for resolving all of the claims in this case and the related cases in an efficient manner.  If the court considered only the client-specific work, it would reduce the requested hours by up to 69%, since Lewis Rice's work for the vast majority of this time period concerned the claims of up to twenty plaintiffs (out of twenty-nine total) who did not have successful claims.  However, Lewis Rice also performed a significant amount of generally applicable work.  Therefore, the court reduces plaintiffs' requested hours for each timekeeper by 20%, leading to an award of $95,250.40 for this time period (the requested amount of $119,115.50 minus $52.50 for the excessive paralegal time for filing a status report, minus 20% of the difference).

During the fourth time period, Lewis Rice's work related to determining the just compensation owed to the eleven Group 1 plaintiffs, all of whom had successful claims, and determining the government's liability to pay just compensation to the Group 2 plaintiffs, whose claims were ultimately not successful.[18]  The work performed for the Group 2 plaintiffs during this time period had no relevance to any of the successful claims in this case.  As a result, the

---

[17]  The four plaintiffs with successful, or likely successful, claims that would be added in the first amended complaint are Burnett Partnership LLP, Mimir Partners LLP, and Three Feathers Realty Group LLP; the Eadses; Ms. McAffee and Ms. Strossner; and Ms. Wood.

[18]  At the beginning of the next time period, the court moved five plaintiffs from Group 2 to Group 3 because their claims involved both an issue resolved in defendant's favor (making that aspect of their claims unsuccessful) and other issues not briefed by the parties during the fourth time period.

plaintiffs with successful, or likely successful, claims cannot recover attorneys' fees for Lewis Rice's efforts on behalf of the Group 2 plaintiffs.  The court has identified twenty-three billing entries applicable only to the Group 2 plaintiffs, all of which occurred in 2020:  for Ms. Brinton, 0.3 hours on September 14, 1.6 hours on September 21, 1.6 hours on September 22, 0.4 hours on September 23, 1.6 hours on September 28, 0.8 hours on November 4, 0.3 hours on November 10, 0.9 hours on November 13, 1.3 hours on November 16, 0.7 hours on November 17, 1.9 hours on November 18, and 0.3 hours on December 14; for Ms. Largent, 0.5 hours on September 21, 0.3 hours on September 23, 0.5 hours on September 28, 0.8 hours on October 29, 0.3 hours on November 13, 0.5 hours on November 18, and 0.4 hours on December 9; for paralegal Meredith Shrinivas, 0.8 hours on September 23, 0.5 hours on September 28, and 0.7 hours on November 18; and for paralegal Anna Roland, 0.1 hours on December 9.  See Pls.' Ex. A-1 at 11-12.  At the allowed hourly rates, these hours translate into $6,844.20 for Ms. Brinton's work, $1,963.50 for Ms. Largent's work, $400 for Ms. Shrinivas's work, and $11.50 for Ms. Roland's work, for a total of $9,219.50.  The court therefore reduces plaintiffs' requested attorneys' fees of $60,591.00 by $9,219.50, leading to an award of $51,371.50 for this time period.

During the final time period, the work performed by Lewis Rice related to determining the just compensation owed to the eleven original Group 1 plaintiffs, settling the claims of those same plaintiffs (including amounts for attorneys' fees and other litigation expenses), summary judgment briefing for the claims of the Group 3 plaintiffs,[19] determining the disposition of the claims of the five Group 3 plaintiffs, reviewing defendant's offer of judgment for the eleven original Group 1 plaintiffs, and preparing the present motion for attorneys' fees and other litigation expenses.  The only unreimbursable work performed by Lewis Rice during this time period is the work attributable to the claims of the two Group 3 plaintiffs that were dismissed after the aforementioned summary judgment decisions.  The court has identified twenty billing entries that relate to the five Group 3 plaintiffs in general:  for Ms. Brinton, 2.8 hours on April 5, 2021, 0.1 hours on April 7, 2021, 0.3 hours on April 13, 2021, 0.8 hours on April 29, 2021, 0.6 hours on May 3, 2021, 0.3 hours on January 27, 2022, 1.3 hours on April 1, 2022, 1.9 hours on April 4, 2022, and 0.3 hours on April 7, 2022; for Ms. Largent, 0.3 hours on April 5, 2021, 0.2 hours on April 6, 2021, 0.1 hours on April 7, 2021, 0.2 hours on May 3, 2021, 0.3 hours on May 4, 2021, and 0.1 hours on April 14, 2022; and for Ms. Shrinivas, 0.2 hours on April 6, 2021, 3.9 hours on January 25, 2022, 0.8 hours on January 26, 2022, 1.1 hours on January 27, 2022, and 0.4 hours on April 1, 2022.  See id. at 14-15, 17-18.  At the allowed hourly rates, these hours translate into $5,421.50 for Ms. Brinton's work, $775.50 for Ms. Largent's work, and $1,284.00 for Ms. Shrinivas's work, for a total of $7,481.00.  Because the claims of two of the five Group 3 plaintiffs were unsuccessful, the court reduces the hours requested by plaintiffs for work relating to the Group 3 plaintiffs by 40%, leading to an award of $80,436.60 for this time period (the requested amount of $83,429.00 minus 40% of $7,481.00).

---

[19]  Although the parties in this case did not brief summary judgment motions for the Group 3 plaintiffs, it appears that Lewis Rice did perform some work in January 2022 related to the briefing in the related cases.  See Pls.' Ex. A-1 at 15.

### iii. Block Billing

Defendant's final contention regarding the reasonableness of the hours expended by Lewis Rice attorneys and paralegals relates to the practice of block billing. "Block billing entails 'lumping tasks together in time entries rather than making such entries task-by-task.'" McCarty, 142 Fed. Cl. at 628 (quoting McAfee v. Boczar, 738 F.3d 81, 90 (4th Cir. 2013)). The Federal Circuit, in patent litigation, has affirmed trial courts' determinations regarding block billing with little commentary. See, e.g., Raniere v. Microsoft Corp., 887 F.3d 1298, 1309 (Fed. Cir. 2018) (upholding the district court's finding that specific time entries were not block billed); Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd., 726 F.3d 1359, 1369 (Fed. Cir. 2013) (upholding the district court's reduction of block-billed time entries by 75%). Other courts of appeals have upheld a wide range of percentage reductions for block billing—from 5% to 50%. See McCarty, 142 Fed. Cl. at 629 (documenting the permitted reductions). Above all, the court must consider whether the disputed entries "provide a sufficient level of detail to allow [the court] to effectively review the reasonableness of the claimed hours." Id.

According to defendant, Lewis Rice's billing entries reflect "extensive block billing," making it difficult to ascertain the reasonableness of the time spent on the individual tasks or whether work is being duplicated. Def.'s Resp. 20. It therefore "proposes applying a 10% reduction to all" entries for which there is no "specific time listed for each task," id., leaving it to the court to identify those entries and perform the calculation. Plaintiffs do not respond to defendant's block-billing contentions.

There is no question that the first thirteen months of Lewis Rice's billing entries include many instances of block billing. For a handful of these entries, this practice makes it difficult to ascertain the reasonableness of the time expended for the component tasks. See, e.g., Pls.' Ex. A-1 at 6 (setting forth a December 3, 2019 billing entry for Ms. Brinton in which she recorded 4.5 hours to perform the following tasks: "[w]ork on draft title stipulations; e-mail correspondence with B. Herman re same; conduct research re relevant Indiana case law; review valuation maps and relevant Court of Federal Claims decisions; e-mail correspondence with counsel for Fishers and Noblesville"). But for most of the block-billed entries, it is apparent that the time recorded is a reasonable amount of time to perform all of the block-billed tasks and/or all of the block-billed tasks are clearly related to each other and are otherwise reimbursable. See, e.g., id. at 4 (setting forth a July 12, 2019 billing entry for Ms. Brinton in which she recorded 2.2 hours to perform the following tasks: "[f]inalize first amended complaint; file same; final review and edits to claim book and initial disclosures; conference with F. Rubio re same; telephone conference with counsel for the Cities of Fishers and Noblesville; conference with M. Largent re same; e-mail correspondence with DOJ"), 5 (setting forth an October 2, 2019 billing entry for Ms. Brinton in which she recorded 7.5 hours to perform the following tasks: "[p]repare for client meetings; travel to Indiana from St. Louis, Missouri; attend meetings with clients; inspect trail"). Indeed, the billing records in this case are unlike those that the undersigned reviewed in Hardy, where "[o]ver the years spent on [that] case, plaintiffs' attorneys and paralegals billed time for a wide variety of tasks in four-to-ten-hour increments." 157 Fed. Cl. at 476; see also id. at 476 n.9 (reciting the contents of a ten-hour billing entry in which the timekeeper worked on various tasks related to the claims book, drafted an amended complaint, prepared a request for a deed, and updated the "Class Index"). Because almost all of the block-billed entries in this case include

sufficient information to allow the court to determine the reasonableness of the time expended, a percentage reduction for block billing is not warranted.[20]

### c. Summary

To summarize the court's determinations with respect to the reasonable amount of attorneys' fees that are subject to reimbursement by the government under the URA for work performed by Lewis Rice on the successful, or likely successful, claims, the court concludes that the fourteen plaintiffs with such claims are entitled to fees of $266,959.22:  $11,503.97 for the work performed from January 22, 2019, to March 14, 2019; $28,396.75 for the work performed from March 15, 2019, to July 11, 2019; $95,250.40 for the work performed from July 12, 2019, to July 21, 2020; $51,371.50 for the work performed from July 22, 2020, to March 22, 2021; and $80,436.60 for the work performed from March 23, 2021, to the present.

### 2. Other Litigation Expenses

The URA does not limit successful plaintiffs to the recovery of attorneys' fees; they may also be reimbursed for other expenses they incurred in prosecuting their claims.  Here, plaintiffs seek reimbursement for $57,745.09 in various additional expenses related to the litigation that were paid by Lewis Rice.  In support of their request, they provide a table indicating the date, amount, and description of each such expense.  Additionally, according to defendant, plaintiffs provided defendant with documentation in support of most of the claimed expenses.  Defendant states that "[b]ased on review of that documentation and Plaintiffs' claims, [it] believes that the majority of Plaintiffs' claimed Lewis Rice expenses are documented, reasonable, and necessary." Def.'s Resp. 25.

Defendant lodges only one objection to plaintiffs' request.  It maintains that the twenty-six "[p]ostage" and "Federal Express" expense entries, Pls.' Ex. A-2 at 2-3, are improper because plaintiffs do not substantiate them through documentation or explanation.  It therefore contends that it should not be required to reimburse plaintiffs for these items.  Although they were aware of this objection, plaintiffs did not provide any substantiation for the postage and shipping expenses in their reply.

Postage is generally a reimbursable expense, "assuming [the charges] are documented and reasonably necessary to prosecution of the claim."  R.C. Constr. Co. v. United States, 42 Fed. Cl. 57, 63-64 (1998); see also Halverson v. Sec'y of HHS, No. 15-227V, 2021 WL 2768339, at *4 (Fed. Cl. Spec. Mstr. May 25, 2021) (denying reimbursement of United Parcel Service costs for which invoices were not provided).  For expedited delivery services in particular, plaintiffs must provide enough information to "allow the Court to determine what documents were transmitted and to whom, and whether the use of the expedited delivery service was reasonable or necessary, as opposed to merely convenient for counsel."  Bratcher, 136 Fed.

---

[20]  This is not to say that the court approves of block billing.  The court commends the Lewis Rice timekeepers for adopting the somewhat regular practice, starting with Ms. Largent's February 19, 2020 billing entry, of indicating the amount of time expended on each task in a billing entry that covers multiple tasks.

Cl. at 801.  Because plaintiffs failed to provide any documentation or explanation for their postage and shipping expenses, the court deducts the $2,704.38 claimed for these expenses from plaintiffs' total amount requested, resulting in an award of $55,040.71 for the litigation expenses paid by Lewis Rice.

### 3.  Allocation Among the Eligible Plaintiffs

The final task relating to Lewis Rice's claimed attorneys' fees and other litigation expenses is to allocate the amounts awarded among the fourteen plaintiffs with successful, or likely successful, claims:  the eight plaintiffs who filed the present motion, the three plaintiffs whose claims remain pending, and the three Rule 68 plaintiffs, who each received $27,800 for fees and other litigation expenses ($83,400 total) when they accepted defendant's offer of judgment.

The parties offer differing approaches for making this allocation.  Plaintiffs' approach, simply stated, is to credit defendant for the $83,400 it already paid in attorneys' fees and other litigation expenses for the three plaintiffs who accepted the offer of judgment, allocate 1/11th of the balance to each of the remaining plaintiffs, and then award 8/11ths of the balance to the moving plaintiffs.  Defendant's approach is to allocate 1/14th of the award of fees and other expenses to each of the fourteen plaintiffs and then grant the moving plaintiffs 8/14ths of the award.  Plaintiffs' approach would result in $238,599.93 in fees and other expenses for the eleven plaintiffs who did not accept defendant's offer of judgment, with $65,066.20 of that amount allocated to the three plaintiffs with pending claims, and the remaining $173,533.73 awarded to the eight moving plaintiffs.  In contrast, defendant's approach would result in the allocation of $68,999.98 to the three plaintiffs with pending claims, and an award of $183,999.96 to the eight moving plaintiffs.[21]

Defendant's approach is more appropriate for a single reason:  the amount of attorneys' fees and other litigation expenses that defendant paid to the three Rule 68 plaintiffs was paid pursuant to an offer of judgment.  In such circumstances, the Attorney General is responsible for determining the amount that would reimburse a plaintiff for the plaintiff's reasonable fees and other expenses.  See 42 U.S.C. § 4654(c).  Such a determination might be based on factors that the court would not, or could not, consider in reaching its own determination.  Indeed, the court lacks any information regarding the basis of defendant's offer or the Rule 68 plaintiffs' calculus in accepting it.  Thus, it cannot assess the reasonableness of the $83,400 payment.

In sum, the eleven plaintiffs with successful, or likely successful, claims who did not accept defendant's offer of judgment are entitled to a reimbursement of $252,999.94 ($209,753.67 in attorneys' fees and $43,246.27 in other litigation expenses) for the work

---

[21]  The total amount allocated to the eleven plaintiffs who did not accept defendant's offer of judgment is greater under defendant's approach than under plaintiffs' approach due to the magnitude of the total amount of the award.  Had the court started with the amount of attorneys' fees and other litigation expenses claimed by Lewis Rice ($355,374.50 in fees and $57,745.09 in other expenses, for a total of $413,119.59), the amount owed to the eight moving plaintiffs would have been greater under plaintiffs' approach than under defendant's approach.

performed by Lewis Rice.  Of that amount, the court awards the moving plaintiffs $183,999.96 ($152,548.12 in attorneys' fees and $31,451.83 in other litigation expenses).

### C. Reimbursement for Work Performed by ArentFox Schiff

The court next considers the amount of attorneys' fees and other litigation expenses that plaintiffs can recover for the work performed by ArentFox Schiff.  Plaintiffs assert that ArentFox Schiff claims $343,982.00 in fees and $175,759.03 in other expenses for work performed from September 7, 2017, to January 30, 2019, in advance of the filing of the complaints in this case and in <u>ATS Ford</u>.[22]  Of these amounts, plaintiffs seek $74,374.49 and $38,001.95, respectively, for the work related to their claims.  As discussed above, the court will determine reasonable fees using the lodestar calculation and other reasonable expenses in accordance with the relevant caselaw.  It will then allocate the fees and other expenses between the two cases to arrive at the amount due to plaintiffs.

### 1. Attorneys' Fees

### a. Reasonable Hourly Rates

The first component of the lodestar calculation the court will address is the hourly rate.  As reflected by an exhibit attached to plaintiffs' motion with a table of ArentFox Schiff's billing entries, plaintiffs seek hourly rates of $919 for Debra Albin-Riley (a partner) and Stephen S. Davis (an associate), $764 for Ms. Brinton (of counsel) and Ms. Largent (of counsel), and $208 for the law firm's paralegals.  To support their contention that these hourly rates are reasonable, plaintiffs submit a single sworn declaration from an ArentFox Schiff partner, James H. Hulme.  Mr. Hulme represents that ArentFox Schiff's hourly rates "are competitive hourly rates justified by the rates private clients pay for comparable legal representation in the prevailing legal marketplace," Pls.' Ex. B-3 ¶ 5; that "[t]he rates sought by ArentFox [Schiff] in this case for non-partner attorneys based in the firm's St. Louis office are the customary rates at which those same attorneys typically bill ArentFox Schiff's private clients," <u>id.</u> ¶ 6, that hourly rates for associates in the St. Louis office are 15% lower than what associates bill in the Los Angeles, New York City, and District of Columbia offices, <u>id.</u>, and that "ArentFox Schiff's rates charged for the work by each member of the litigation team are fair and appropriate . . . [, and] are comparable to the rates [his] firm charges private clients for work on comparable litigation," <u>id.</u> ¶ 8.  Defendant does not refute Mr. Hulme's statements or otherwise object to the hourly rates requested by ArentFox Schiff.  Nevertheless, given the number of anomalies with the requested rates, plaintiffs have not adequately established their reasonableness.

As an initial matter, the only evidence submitted by plaintiffs in support of their assertion that the requested hourly rates are reasonable is Mr. Hulme's sworn declaration.  Mr. Hulme's statements, while unrebutted by defendant, are self-serving and conclusory, and therefore cannot be afforded great weight.  Moreover, Mr. Hulme provided no information regarding the years of

---

[22] When Ms. Brinton and Ms. Largent moved their practice to Lewis Rice, some of ArentFox Schiff's clients who owned parcels along the railroad line at issue in this case moved with them.

experience for any of the timekeepers identified in the billing entries. While plaintiffs supplied such information concerning Ms. Brinton and Ms. Largent in other sworn declarations, the record lacks any evidence regarding the experience of Ms. Albin-Riley, Mr. Davis, or the paralegals.

Second, plaintiffs do not explain why an associate, Mr. Davis, bills at the same hourly rate as a partner, Ms. Albin-Riley, and more than the hourly rates of the attorneys identified as of counsel.

Third, given the evidence supplied by plaintiffs in support of their contention that the hourly rates sought by Lewis Rice were consistent with the prevailing market rates in St. Louis and the District of Columbia, it is difficult to understand how the hourly rates sought by ArentFox Schiff for work done from 2017 to 2019, which are hundreds of dollars greater than the rates sought by Lewis Rice for work done in later years, can also be consistent with St. Louis and District of Columbia rates.

Fourth, and relatedly, it defies common sense to award plaintiffs attorneys' fees for the work performed by Ms. Brinton and Ms. Largent based on an hourly rate of $764 for the 2017-2019 time period, when they worked at ArentFox Schiff, and based on the significantly lower hourly rates of $550-$660 for the 2019-2022 time period, when they worked at Lewis Rice, given that the type of work did not change and their practice remained in St. Louis.

Fifth, the hourly rates sought by ArentFox Schiff are set forth in the table with their billing entries in a column titled "Current Market Rate," and do not change from 2017 to 2019. As a consequence, plaintiffs may be violating the "no-interest rule," which provides that "recovery of interest on an award of attorney fees is barred unless an award of interest is 'expressly and unambiguously authorized by statute,'" and is a rule that "has been broadly read to reach any attempt to provide additional compensation based on a delayed payment." Biery, 818 F.3d at 714 (quoting Chiu v. United States, 948 F.2d 711, 719 (Fed. Cir. 1991)). In general, the Court of Federal Claims uses historical hourly rates when awarding attorneys' fees. See, e.g., McCarty, 142 Fed. Cl. at 624; Whispell Foreign Cars, Inc. v. United States, 139 Fed. Cl. 386, 401-02 (2018); Campbell, 138 Fed. Cl. at 73-74.

Finally, to the extent that plaintiffs are relying on the data included in the table with ArentFox Schiff's billing entries, such reliance is misplaced. That table includes columns with the following labels: "Historic Market Rate," "Historic Market Value," "Hist DOJ Rate," "Hist DOJ Value," "Curr DOJ Rate," "Curr DOJ Value," "Hist Brugg Rate," "Hist Brugg Value," "Curr Brugg Rate," and "Curr Brug Value." Each of the "rate" columns has a different hourly rate for each timekeeper. For example, for all entries with Ms. Brinton as the timekeeper, the "Historic market rate" is $717, the "Hist DOJ rate" is $494, the "Curr DOJ Rate" is $611, the "Hist Brugg Rate" is $550, and the "Curr Brugg Rate" is $802. Plaintiffs make no attempt to explain how they determined these hourly rates or how these hourly rates might demonstrate the reasonableness of the hourly rates requested by the timekeepers in this case.[23]

---

[23] The court attempted to identify the basis for the two hourly rates associated with the Honorable Eric G. Bruggink—reasonably assuming that "Brugg" and "Brug" refer to him—by

In light of these irregularities, adjustments to the hourly rates sought by ArentFox Schiff are necessary.  See Biery, 818 F.3d at 715 ("It was counsel's burden to provide evidence tending to show an appropriate rate . . . .  When a party has a burden of production, it must submit evidence in order to meet the burden.  When the burden has not been met, it is not the responsibility of a court to delay proceedings and request additional evidence from counsel; it rules on the record before it." (citation omitted)).  The court has already determined that $550 was a reasonable hourly rate for Ms. Brinton in 2019, when she had approximately eleven years of experience, and that $570 was a reasonable hourly rate for Ms. Largent in 2019, when she had approximately twelve years of experience.  These hourly rates, and the hourly rates allowed for 2020 to 2022, are in accord with the hourly rates set forth in the Fitzpatrick matrix.  Accordingly, the court will use that matrix to set Ms. Brinton's and Ms. Largent's hourly rates for 2017 and 2018.  Ms. Brinton shall be compensated at $494 per hour for 2017 and $534 per hour for 2018, and Ms. Largent shall be compensated at $506 per hour for 2017 and $545 per hour for 2018.  These hourly rates are consistent with those allowed by the Court of Federal Claims for Ms. Brinton and Ms. Largent in other cases.  See, e.g., McCarty, 142 Fed. Cl. at 624 (allowing hourly rates of $465-$516 for Ms. Brinton and Ms. Largent for "2016-17"); Campbell, 138 Fed. Cl. at 78 (allowing an hourly rate of $550 for ArentFox Schiff of counsel for "2015-2017").

With respect to Ms. Albin-Riley, caselaw from this court reflects that she was a senior partner with at least thirty years of experience in 2017.  Bratcher, 136 Fed. Cl. at 797 n.4.  This court's caselaw also indicates that in 2017, Mr. Davis was an associate with seventeen years of

---

reviewing Judge Bruggink's publicly available decisions on attorneys' fees in Trails Act cases. It identified two such decisions.  In Campbell, Judge Bruggink determined that reasonable hourly rates for ArentFox Schiff attorneys (including Ms. Brinton, Ms. Largent, and Mr. Davis) and paralegals in "2013-2014" and "2015-2017" were $701 and $749 for partners, $435 and $550 for of counsel, $435 and $490 for associates, and $175 and $190 for paralegals. 138 Fed. Cl. at 78. In Grantwood Village, Judge Bruggink made the following determination regarding the reasonable hourly rates for attorneys and paralegals at a law firm with offices in St. Louis and other cities nationwide:

> [H]ours billed by equity partners will be compensated at the following rates: $170.00 per hour for 1997-1998, $190.00 per hour for 1999, $200.00 per hour for 2000, $250.00 per hour for 2001, and $275.00 per hour for 2002.  Hours billed by senior associates will be compensated at $140.00 per hour for 1999.  Mid-level associate hours will be reimbursed for 1997-1998 at $110.00 per hour, $120.00 per hour for 1999, $140.00 per hour for 2001, and $150.00 per hour for 2002. Those hours billed for junior associates will be reimbursed for 1998-1999 at $100.00 per hour and $120.00 per hour for 2000.  Hours billed for paralegal services will be reimbursed at $90.00 per hour for 1997-2001.  Those hours billed in 2002 for paralegal services will be reimbursed at $95.00 per hour.

55 Fed. Cl. at 488 (footnotes omitted).  Almost none of the hourly rates mentioned in Judge Bruggink's decisions matches the hourly rates in the "Hist Brugg Rate" and "Curr Brugg Rate," columns.

experience.  Id. at 800; Whispell Foreign Cars, 139 Fed. Cl. at 398.  For consistency with the rates allowed for Ms. Brinton and Ms. Largent, the court will use the Fitzpatrick matrix to determine reasonable hourly rates for Ms. Albin-Riley and Mr. Davis.  Ms. Albin-Riley will be compensated at $636 per hour for 2017 and $667 per hour for 2018, and Mr. Davis will be compensated at $556 per hour for 2017 and $593 per hour for 2018.  Although the hourly rates allowed for Ms. Albin-Riley and Mr. Davis vary significantly from case to case in the Court of Federal Claims, the rates allowed here are not out of line with those awarded in other cases.  See, e.g., McCarty, 142 Fed. Cl. at 624 (allowing hourly rates of $543-$581 for Ms. Albin-Riley and $465-$516 for Mr. Davis for "2016-17"); Campbell, 138 Fed. Cl. at 78 (allowing hourly rates of $749 for ArentFox Schiff partners and $490 for ArentFox Schiff associates in "2015-2017").

In contrast to the ArentFox Schiff attorneys, the court's caselaw does not supply any information regarding the experience of the ArentFox Schiff paralegals who performed work related to this case.  However, the caselaw does provide data regarding the hourly rates allowed for ArentFox Schiff paralegals more generally.  In McCarty, the court allowed the paralegals an hourly rate of $157 for "2016-17," 142 Fed. Cl. at 624, and in Campbell, the court allowed the paralegals an hourly rate of $190 for "2015-2017," 138 Fed. Cl. at 78.  The paralegal hourly rates set forth in the Fitzpatrick matrix for 2017 to 2019 fall between these two amounts.  For that reason, and to maintain consistency with the hourly rates allowed for the ArentFox Schiff attorneys, the paralegals will be compensated at $169 per hour for 2017, $179 per hour for 2018, and $189 per hour for 2019.

Applying the reasonable hourly rates allowed by the court to ArentFox Schiff's billing entries results in a total adjusted fee request of $257,662.30.

### b.  Reasonable Hours

Having determined reasonable hourly rates for ArentFox Schiff attorneys and paralegals, the court turns its attention to the other element of the lodestar calculation:  the number of hours reasonably expended by those individuals.  In support of their request for reimbursement, plaintiffs submit, as mentioned above, a table with ArentFox Schiff's billing entries that includes, for each entry, the date, timekeeper, number of hours, hourly rate, and total fee, as well as a description of the work performed.  As reflected in this table, the attorneys and paralegals worked a total of 978.9 hours from September 7, 2017, one month after the three municipalities advised the Board of their collective desire to invoke the Trails Act, to January 30, 2019, approximately one month after the Board issued the NITUs on December 21, 2018, and nine days after Ms. Brinton and Ms. Largent moved their practice to Lewis Rice.  All but 6.4 hours of this work was performed prior to the issuance of the NITUs.

Defendant maintains that the number of hours claimed by plaintiffs for ArentFox Schiff's work is "patently unreasonable," arguing:

> Plaintiffs do not offer any basis (and there is no reasonable one here) for spending 970 hours on this matter before the complaint was filed, 99% of which was before there was ever an alleged taking [as represented by the issuance of the NITUs]. Nor was it reasonable for ArentFox [Schiff] to spend more hours in prelitigation

work than the [820.55 hours] Lewis Rice spent to litigate the case. Moreover, Plaintiffs have offered no justification for billing fees eighteen months before the complaint was filed and fifteen months before the NITU.

Def.'s Resp. 34. In response, plaintiffs assert that all of the billing entries represent work that "was important to the success of their claims," Pls.' Reply 24, and that in other cases, such prelitigation work was deemed to be compensable.

Upon reviewing ArentFox Schiff's billing entries, the court agrees with plaintiffs that much of the type of work described is work typically done to prepare for the filing of a Trails Act suit. However, the court agrees with defendant that work more properly classified as client development cannot be reimbursed. See Hensley, 461 U.S. at 434 ("Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." (quoting Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc))). ArentFox Schiff's billing entries refer to both clients and landowners, and based on the context of each term's usage, it is likely that in most of the entries, "landowner" is a synonym for "potential client."[24] See, e.g., Pls.' Ex. B-1 at 2 (setting forth a September 28, 2017 billing entry for "[c]orrespondence with Indiana landowners" and "preparation for upcoming meetings"), 3 (setting forth an October 17, 2017 billing entry with the following description that distinguishes between clients and landowners: "Review and manage drafts of correspondence to clients re case status; work on preparations for property owner-client meetings; manage parcel data for Marion County; work on landowner correspondence; review and manage additional original conveyances; review and manage revised parcel data."), 5 (setting forth a January 29, 2018 billing entry with the following description that distinguishes between clients and landowners: "Correspondence with Landowners; preparation for client meetings."). As such, the work pertaining to landowners is for the solicitation of new clients, the cost of which cannot be borne by the government. There are fifty-nine billing entries that refer to "landowner" or "landowners," representing 189.8 hours of work by four timekeepers ($43,688.40 in total fees). To account for the fact that sixteen of these entries also describe work performed for clients, which may have been reasonable, the court reduces the requested hours for each timekeeper who performed landowner-related work by 80% (a reduction of $34,950.72) rather than by 100%.

---

[24] In addition, the court takes judicial notice pursuant to Rule 201(b)(2) of the Federal Rules of Evidence of a November 20, 2017 article in the Indianapolis Star reporting that ArentFox Schiff "sent notices to the landowners, seeking to help them recover their 'just compensation,'" and would be "hold[ing] three informational meetings on Monday and Tuesday with landowners in Hamilton County." John Tuohy, Homeowners Along Nickel Plate to Cash in When Trail Is Built, Indianapolis Star (Nov. 20, 2017, 10:29 AM), https://www.indystar.com/story/news/local/hamilton-county/2017/11/20/homeowners-along-nickel-plate-cash-when-trail-built/874172001/; see also id. (indicating that the three public meetings would be held on Monday, November 20, 2017, at the Hampton Inn, and Tuesday, November 21, 2017, at the Hamilton North Public Library and the Tipton American Legion). Sixteen of ArentFox Schiff's billing entries referring to landowners were dated on or before November 21, 2017. See Pls.' Ex. B-1 at 2-4.

Aside from these landowner-related billing entries, the record lacks any evidence that the work performed by ArentFox Schiff predated the decision to file suit. See Emeny, 526 F.2d at 1124. Consequently, defendant has not established that the number of hours expended by ArentFox Schiff were unreasonable based on the grounds its asserts.

However, there is another basis for declaring the hours expended to be unreasonable. Much of the work described in ArentFox Schiff's billing entries is client-specific (for example, 152 entries mention "correspondence to clients," 123 entries mention "client meeting" or "client meetings," and 56 entries mention "client parcel") and is not generally applicable to all claims, see Pls.' Ex. B-1, but plaintiffs make no allowance for the fact that not all of ArentFox Schiff's clients had successful claims. A reduction in the number of hours allowed is required to compensate for this shortcoming.

The court employs a multistep process to determine the appropriate reduction. The first two steps are to ascertain, to the extent possible, the number of clients represented in the ArentFox Schiff billing entries and the number of those clients whose claims were ultimately successful. The first number can be approximated by counting the number of plaintiffs included in the original complaints in this case and in ATS Ford, both of which were filed in March 2019, since it is reasonable to assume that Lewis Rice and ArentFox Schiff would have included as many clients as possible in those complaints. There were fifteen plaintiffs included in the original complaint in this case and sixty-three plaintiffs in the original complaint in ATS Ford, for a total of seventy-eight plaintiffs.[25] The second number is determined by comparing the identities of the plaintiffs whose claims have resulted, or likely will result, in judgment in their favor with the names of the plaintiffs whose claims were included in the original complaints. Out of the fourteen plaintiffs with successful, or likely successful, claims in this case, five were named in the original complaint, and out of the nineteen plaintiffs with successful, or likely successful, claims in ATS Ford, fifteen were named in the original complaint. In sum, only twenty of the roughly seventy-eight clients represented in ArentFox Schiff's billing entries— approximately 26%—had, or likely will have, successful claims.

The third step is to determine the appropriate reduction to reflect the fact that approximately 74% of the clients represented in ArentFox Schiff's billing entries had unsuccessful claims. A full 74% reduction is not appropriate because many billing entries describe work that is generally applicable to multiple (or all) claims rather than work that is client-specific. See id. (setting forth, for example, seventy-two billing entries that refer to original conveyances and nine billing entries that refer to valuation maps). Accordingly, the court reduces the requested hours for each timekeeper—those remaining after the reduction for landowner-related billing entries—by 50% (a reduction of $111,355.79).

The next task is to allocate the remaining $111,355.79 in attorneys' fees between this case and ATS Ford. As previously determined, twenty of the clients represented in ArentFox Schiff's billing entries had successful claims. Five of those clients became successful plaintiffs

---

[25] As noted above, the court uses "plaintiff" as a synonym for "property owner," which may be an individual, organization, multiple individuals, or multiple organizations. See supra note 1.

in this case, and fifteen of those clients became, or will likely become, successful plaintiffs in
ATS Ford.  Accordingly, a 25%/75% split is warranted, leading to an allocation of $27,838.95
for the plaintiffs in this case, and $83,516.84 for the plaintiffs in ATS Ford.

       Finally, the $27,838.95 in attorneys' fees allocated to this case must be divided among
the fourteen plaintiffs with successful, or likely successful, claims:  the eight plaintiffs who filed
the present motion, the three plaintiffs whose claims remain pending, and the three Rule 68
plaintiffs.  Using the approach it applied to the attorneys' fees and other litigation expenses
claimed by Lewis Rice, the court concludes that the eleven plaintiffs who did not accept
defendant's offer of judgment are entitled to a reimbursement of $21,873.46 in attorneys' fees
for the work performed by ArentFox Schiff.  Of that amount, the court awards the moving
plaintiffs $15,907.97.

## 2.  Other Litigation Expenses

       As noted above, plaintiffs also seek reimbursement for the other litigation expenses
incurred by ArentFox Schiff related to this case and ATS Ford in the amount of $175,759.03.  In
support of their request, they provide a table indicating the date, amount, and description of each
such expense.  They did not, however, submit any documentation or provide any explanation
(aside from what was contained in the descriptions) to substantiate the expenditures.  Rather,
they rely on Mr. Hulme's sworn statement that "[t]he expenses the owners' and their counsel
incurred were reasonable and appropriate."  Pls.' Ex. B-3 ¶ 10.  Defendant maintains that the
requested expenses are unreasonable for the same reason it insisted that the request for ArentFox
Schiff's attorneys' fees was unreasonable, and argues that plaintiffs' claim for these expenses
"also fails because Plaintiffs have not provided any documentation supporting the expenses."
Def.'s Resp. 34 n.19.

       Only "reasonable" litigation expenses are recoverable under the URA.  42 U.S.C.
§ 4654(c).  The plaintiff bears the burden to demonstrate the reasonableness of the claimed
expenses.  See, e.g., Otay Mesa Prop., 124 Fed. Cl. at 153 (holding that the plaintiff "met its
burden by establishing that the contested expenses [were] reasonable, supported, and therefore
compensable").  This burden is satisfied through the submission of "adequate documentation that
includes sufficient detail to allow the court to determine whether the expenses are reasonable."
Stimson Lumber, 154 Fed. Cl. at 709.

       For many of ArentFox Schiff's claimed litigation expenses, the lack of adequate
documentation or explanation precludes a determination that those expenses were reasonable.
The largest category of unsubstantiated expenses is printing and photocopying.  There are fifty-
three expense entries for "color duplicating" or "duplicating summary" in which the description
merely identifies the name of the person making the copies, the number of copies made, and the
date and time of the copying.  Pls.' Ex. B-2.  There are an additional twelve expense entries for
"printing/binding" in which the description merely indicates the attributes of the documents
being printed (e.g., black and white, color, oversize).  Id.  The information provided in these
descriptions is insufficient to determine that the copying and printing could be chargeable to a
client (and, therefore, the government) or is, instead, related to client solicitation.  And, because
these expenses were incurred prior to the filing of the complaints in this case and in ATS Ford,

there is no way to match the expenses to particular docket entries. Accordingly, the court reduces plaintiffs' requested amount for litigation expenses by the full amount of these unsubstantiated items: $87,482.38.

The next largest category of unsubstantiated expenses is postage. There are forty-nine expense entries for "postage" in which the description identifies only the name of the person producing the postage and the amount of the postage. Id. This information is insufficient to determine that the postage could be chargeable to a client (and, therefore, the government) or is, instead, related to client solicitation. And, because these expenses were incurred prior to the filing of the complaints in this case and in ATS Ford, there is no way to match the expenses to particular docket entries. Accordingly, the court reduces plaintiffs' requested amount for litigation expenses by the full amount of these unsubstantiated items: $14,277.22.

The final two categories of unsubstantiated expenses are much smaller, but no less problematic. First, there are eleven expense entries for database searches in PACER, but plaintiffs do not explain why such searches could be properly charged to a client (and, therefore, the government). The court therefore reduces plaintiffs' requested amount for litigation expenses by the full amount of these unsubstantiated items: $190.27. Second, there are thirteen expense entries from November 20, 2017, to November 22, 2017, that refer to "landowner meetings" or "property owner meetings." Id. Given the distinction between landowners and clients identified by the court in ArentFox Schiff's attorneys' fees billing entries, it is appropriate to reduce plaintiffs' requested amount of expenses by the full amount of these unsubstantiated items: $1,093.90.[26]

To sum up, plaintiffs' request for non-attorneys'-fees litigation expenses that were incurred by ArentFox Schiff must be reduced by the $103,043.77 in unsubstantiated expenses. The balance, $72,715.26, must be further reduced to reflect the fact that roughly 74% of the clients represented in ArentFox Schiff's expense entries had unsuccessful claims. Accord Campbell, 138 Fed. Cl. at 78; Bratcher, 136 Fed. Cl. at 801. As it did with ArentFox Schiff's claimed attorneys' fees, the court reduces the balance by 50% (a reduction of $36,357.63).

The remaining amount—$36,357.63—must then be divided between this case and ATS Ford. Applying the previously determined 25%/75% split, $9,089.41 is allocated to this case and $27,268.22 is allocated to ATS Ford.

Finally, the $9,089.41 in litigation expenses allocated to this case must be divided among the fourteen plaintiffs with successful, or likely successful, claims: the eight plaintiffs who filed

---

[26] There are seventy-seven entries that refer to "property owner-client meetings" that occurred in October 2017, February 2018, July 2018, and September 2018. Pls.' Ex. B-2. Presumably, ArentFox Schiff attorneys and paralegals were using these visits to Indiana for meetings with both prospective clients and actual clients. Because reasonable expenses associated with client meetings are reimbursable, the court will not reduce the amounts requested for these expenses on the ground that meetings with prospective clients were also held. See Smith, 995 F.3d at 134 ("[C]ourts properly award attorney fees for time necessarily spent on a successful claim, even if that time was also spent on unsuccessful claims.").

the present motion, the three plaintiffs whose claims remain pending, and the three Rule 68 plaintiffs. Using the previously adopted approach, the court concludes that the eleven plaintiffs who did not accept defendant's offer of judgment are entitled to a reimbursement of $7,141.68 for the expenses incurred by ArentFox Schiff. Of that amount, the court awards the moving plaintiffs $5,193.95.

### 3. Summary

In sum, the eleven plaintiffs with successful, or likely successful, claims who did not accept defendant's offer of judgment are entitled to $29,015.14 ($21,873.46 in attorneys' fees and $7,141.68 in other litigation expenses) for the work performed by ArentFox Schiff. Of that amount, the court awards the moving plaintiffs $21,101.92 ($15,907.97 in attorneys' fees and $5,193.95 in other litigation expenses).

## III. CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** plaintiffs' motion, and awards the eight moving plaintiffs $205,101.87 in attorneys' fees and other litigation expenses for the work performed by ArentFox Schiff and Lewis Rice, broken down as follows:

| Law Firm | Attorneys' Fees | Other Litigation Expenses | Total |
|---|---|---|---|
| ArentFox Schiff | $15,907.97 | $5,193.95 | $21,101.92 |
| Lewis Rice | $152,548.12 | $31,451.83 | $183,999.96 |
| Total | $168,456.09 | $36,645.78 | $205,101.87 |

Pursuant to RCFC 54(b), there being no just reason for delay, the clerk shall enter judgment for plaintiffs accordingly.

Further, the parties shall file a joint status report to update the court on their efforts to resolve the claims of the three remaining plaintiffs **no later than Wednesday, February 15, 2023**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge